**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| JESUS MANUEL GOMEZ GONZALEZ,<br><br>Plaintiff/Petitioner,<br><br>vs.<br><br>MORAIMA PORTILLO VALENZUELA,<br><br>Defendant/Respondent. | **4:26-CV-3051**<br><br><br>**PETITIONER'S TRIAL BRIEF** |

## I. NATURE OF THE PROCEEDING

This is an action under the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 ("ICARA"). Petitioner Jesus Manuel Gomez Gonzalez seeks an order returning two children — A.G.P., born December 2013, and E.G.P., born April 2016 — to Mexico, so that the courts of the State of Chihuahua may decide where and with whom the children should live.

The question presented to the Court is narrow: whether the children were wrongfully removed from their habitual residence in breach of Petitioner's rights of custody under Chihuahuan law, and if so, whether Respondent carries her burden on one of the Convention's narrow exceptions.

What remains is A.G.P. and E.G.P. As to them, the documentary record is largely undisputed, and it establishes each element of Article 3. Respondent's defenses rest almost entirely on her own declaration, which is internally inconsistent on the incidents that matter most, silent as to the thirty-three months preceding the removal, and contradicted on several points by the certified Mexican court records that Respondent herself signed.

## II. STATEMENT OF FACTS

### A. The parties, the children, and the Mexican judgment.

Petitioner and Respondent married on February 12, 2010, in Benito Juárez, Namiquipa, Chihuahua. Three children were born of the marriage, each in the State of Chihuahua: S.G.P. in July 2010; A.G.P. in December 2013; and E.G.P. in April 2016. Answer ¶¶ 1, 6-9 (Filing No. 24).

Respondent commenced divorce proceedings on or about June 23, 2020, in *Expediente* 294/2020 before the Second Family Court by Hearings of the Judicial District of Benito Juárez, sitting in Cuauhtémoc, Chihuahua. Answer ¶ 10. On March 8, 2021, that court entered final judgment dissolving the marriage and approving the parties' written agreement in its entirety. Filing No. 3-7.

Clause SEGUNDA of the approved agreement is the operative custody provision. The certified English translation filed with the Amended Petition renders it as follows:

> SECOND: The Legal Custody of our minor children [S.G.P., A.G.P. and E.G.P.], will exercise it at all times both parents, madam Moraima Portillo Valenzuela and mister Jesús Manuel Gómez González and, only will lose it in the form and under the terms that the Law establishes; and as regards to the definitive physical custody of the same will be in favor of madam Moraima Portillo Valenzuela, who will exercise in the address located in Santa Catalina de Villela, municipality of Namiquipa, Chihuahua.

Filing No. 3-7.

Accordingly, parental authority is held and exercised by both parents at all times, and it is lost only in the manner and on the terms established by law, and while Respondent has physical custody, the judgment fixes the place where that custody is to be exercised: Santa Catalina de Villela, Namiquipa, Chihuahua.

Clause TERCERA establishes regular parenting time for Petitioner – alternating midweek and weekend periods, with overnights in the care of Petitioner and the paternal grandparents;

alternating weeks during the summer and Easter vacation periods; and establishing an alternating December vacation period, defined in the translation of record as "the week that has the twenty-fourth day of said month." Filing No. 3-7.

**B. The children's lives in Mexico.**

A.G.P. and E.G.P. were born in Chihuahua and lived there without interruption from birth until January 2025 – a period of eleven years for A.G.P. and eight for E.G.P. They attended school in Mexico, received medical and mental-health care in Mexico, and had their extended family, including Petitioner and their grandparents, in Mexico. Decl. of Jesus Manuel Gomez Gonzalez ¶¶ 12–13 (Filing No. 18).

Petitioner's account of his role is specific and was given to the Mexican Central Authority nine months before this suit was filed. The English translation filed with the Amended Petition reads: "some days during the week the[y] stay with me and their paternal grandmother. I take them and accompany them to their extracurricular and sport activities, to their therapies and try to spend most of my time with them." Filing No. 3-10. Petitioner also arranged ongoing treatment in Mexico for S.G.P.'s glaucoma and therapy for the children following the divorce. Filing No. 18 ¶ 11.

**C. December 2024 and the January 30, 2025 proceeding.**

The children were with Petitioner for a period between December 30, 2024, and January 14, 2025, and Petitioner returned them to Respondent on January 14, 2025. Answer ¶ 15. During that same period, on January 6, 2025, Petitioner filed a written submission with the Second Family Court reporting that Respondent intended to take the children to the United States without his consent. Filing No. 3-10; Filing No. 18 ¶ 17. The court directed Respondent to abstain from removing the children "without the consent of their father o[r] legal authorization,"

required her to produce the children's passports and laser visas, and set a proceeding for January 30, 2025, at 10:00 a.m. Filing No. 3-7.

A proceeding occurred on or about January 30, 2025. Answer ¶ 18. Respondent did not produce the passports or the laser visas. Filing No. 3-7. Within a day or two, Respondent took the three children across the border to the United States. Answer ¶ 19.

**D. After the removal.**

Petitioner returned to the Mexican court on February 5, 2025. On February 10, 2025, that court entered the order that is Petitioner's Exhibit 6. It recites the prior warnings to Respondent and her failure to produce the travel documents, and states that "both parties together exercise the legal custody of the mentioned children." Filing No. 3-7. It further warns that such conduct "gives place to the loss of the rights subjected of the exercise of the legal custody that has the subtractor" ("dé lugar a la pérdida de los derechos derivados del ejercicio de la patria potestad que tenga el sustractor") — that is, that a parent who abducts the children stands to lose the rights derived from the exercise of parental authority. *Id*. The court referred the matter to the Public Ministry, which was notified on February 13, 2025. *Id*.

Petitioner submitted his Request for International Return through the Mexican Central Authority on April 15, 2025. Filing No. 3-10. A Mexican arrest warrant was issued for Respondent on September 11, 2025. Filing No. 3-9. Petitioner secured counsel in the United States on or about December 31, 2025, after a pro bono referral that took more than six months to process. Filing No. 18 ¶ 27. This action was filed on February 16, 2026.

## III. ARGUMENT

### A. Petitioner establishes a prima facie case of wrongful removal under Article 3.

A petitioner must show by a preponderance of the evidence that the child was habitually resident in the state of origin immediately before removal; that the removal breached rights of custody attributed to the petitioner under that state's law; and that the petitioner was actually exercising those rights at the time of removal, or would have been but for the removal. Convention art. 3; 22 U.S.C. § 9003(e)(1)(A).

#### 1. Mexico was the habitual residence of A.G.P. and E.G.P.

Habitual residence turns on "the totality of the circumstances specific to the case," and asks where the child "is at home, at the time of removal." *Monasky v. Taglieri*, 589 U.S. 68, 71, 84 (2020). There are "no categorical requirements for establishing a child's habitual residence." *Id.* at 80.

A.G.P. and E.G.P. were born in Chihuahua and had lived nowhere else prior to their removal to the United States. They were schooled there, treated by physicians and a therapist there, and surrounded there by both parents' extended families. A judgment of a Chihuahuan court fixed the address at which their custody was to be exercised in Chihuahua. On any reading, Mexico was where A.G.P. and E.G.P. were at home in January 2025.

Respondent's answer denies "that the Children were habitually resident with Petitioner, as opposed to with Respondent." Answer ¶ 27. Whether the children lived primarily with Petitioner or Respondent is beside the point. Under *Monasky*, a child habitually resides in a particular country, not with a particular parent. 589 U.S. at 84. Respondent has never contended that the children lived anywhere but Chihuahua, Mexico before January 30, 2025, and her own

declaration confirms that the family's entire life was in Chihuahua before she removed the children to Mexico. Portillo Decl. ¶¶ 3–57.

**2. The removal breached Petitioner's rights of custody under Chihuahuan law.**

"Rights of custody" under the Convention "shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention art. 5(a). In *Abbott v. Abbott*, 560 U.S. 1 (2010), the Supreme Court held that a *ne exeat* right—a right to consent before a child's removal from the country—is a right of custody within the meaning of the Convention. *Id.* at 10.

Chihuahuan law supplies Petitioner with precisely such a right. Article 398 of the Civil Code for the State of Chihuahua provides:

> As long as the child remains subject to parental authority, he may not leave the house of those who exercise it without permission from them or by decision of competent authority. The removal or retention of the child outside the place of habitual residence, without the authorization of those who are exercising parental authority or have custody, will entitle them to the restitution procedure established in the Code of Civil Procedure. The illegal conduct of the abductor or retainer will result in the loss of the rights they have with regard to the child.

Filing No. 3-11. Article 391 provides that parental authority over the children of a marriage is exercised "[f]or the father and the mother." *Id*. Parental authority ends only on death, emancipation, or majority, art. 420; is lost only on the enumerated grounds of article 421 or under article 398; and is suspended only on the grounds of article 424. *Id.*

Respondent's contrary position is that Petitioner held "a mere right of access or a limited ne exeat-type right." Answer ¶ 27. *Abbott* holds that a *ne exeat* right is a right of custody. 560 U.S. at 5. Respondent therefore concedes the element it means to dispute.

Petitioner further holds *patria potestad*, rendered "Legal Custody" in the translation of the judgment and "parental authority" in the translation of the Civil Code, over the children. The

March 8, 2021 judgment plainly stated such in terms that both parties signed. Filing No. 3-7. The February 10, 2025 order reiterated the same eleven days after the removal. *Id*.

Respondent's declaration asserts that Petitioner's conduct "meant that he had lost patria potestad." Portillo Decl. ¶ 61. That is a legal conclusion about foreign law, offered by a lay witness, and it is wrong on the face of the Code. Patria potestad is lost only "in the form and under the terms that the Law establishes," not by one parent's assessment of the other. Nothing in the record suggests that any Mexican court has ever terminated, suspended, or limited Petitioner's *patria potestad*. In fact, the only Mexican order addressing the subject after the removal holds the opposite. Filing No. 3-7.

**3. Petitioner was actually exercising his rights of custody.**

Courts "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child," and a parent "cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1065-66 (6th Cir. 1996), quoted and adopted in *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005).

Respondent's Sixth Defense asserts that "[a] petitioner whose children's continuous daily lives fell entirely within the custodial parent's household has not established actual exercise under Article 3(b)," *citing Baxter*. However, *Baxter* holds the reverse. The Third Circuit in *Baxter* adopted the liberal *Friedrich* standard and held that "[r]educed contact or lack of financial support over such a short period of time"—the few weeks following the removal—did not defeat exercise. 423 F.3d at 369-70. Respondent's Sixth Defense also states that Petitioner's "own Central Authority submission (Exhibit J), on information and belief, acknowledges only sporadic contact." Exhibit J contains no such acknowledgment. What Exhibit J says is that the children

stayed with Petitioner several days each week and he took them to their activities and their therapy. Filing No. 3-10.

There is neither abandonment nor anything close to it on the record before this Court. Petitioner had court-ordered parenting time and exercised it; kept the children overnight; drove them to school activities, sports, and therapy; and paid child support even after Respondent removed the children to the United States, as the February 10, 2025 order records. Filing No. 3-7. He had the children in his care from December 30, 2024 into January 2025—which Respondent admits. Answer ¶ 15. When he learned of Respondent's intent to remove the children to the United States, he promptly notified the court for intervention. Filing No. 3-10.

**B. Respondent cannot carry her burden under Article 13(b).**

Article 13(b) requires clear and convincing evidence that return "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 22 U.S.C. § 9003(e)(2)(A). Clear and convincing evidence means that the grave risk is "highly probable." *Mejia Rodriguez v. Reyes Molina*, 96 F.4th 1079, 1082–83 (8th Cir. 2024). The harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another," and must reach "a degree that also amounts to an intolerable situation." *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (*quoting Thomson v. Thomson*, 119 D.L.R.4th 253, 286 (Can. 1994), and *In re A. (A Minor)*, [1988] 1 F.L.R. 365, 372 (Eng. C.A.)). The Eighth Circuit has identified two types of grave risk as appropriate under Article 13(b): sending a child to "a zone of war, famine, or disease," or "cases of serious abuse or neglect." *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003) (en banc). This case contains neither.

Respondent's declaration describes a series of incidents between 2008 and May 2022, which Petitioner denies. He did not abuse Respondent, he did not endanger the children, and he

is not involved with any criminal organization. Nevertheless, assuming *arguendo* the truth of everything her declaration asserts, the defense fails, because what Respondent describes is not what Article 13(b) requires.

**1. Taken at face value, the allegations fall well below the threshold the case law sets.**

The most useful measure of Article 13(b) is what courts have actually found sufficient. The Sixth Circuit's framework in *Simcox v. Simcox*, 511 F.3d 594, 607-08 (6th Cir. 2007), sorts cases into three categories. The first is cases where "the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id.* at 607. The second is cases where the abuse is "substantially more than minor, but is less obviously intolerable," calling for a fact-intensive inquiry into "the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.* The third is cases where "the abuse is relatively minor," and "it is unlikely that the risk of harm caused by return of the child will rise to the level of a 'grave risk' or otherwise place the child in an 'intolerable situation' under Article 13b." *Id.* at 608. *Simcox* itself was determined to be in the second category. In that case, there were repeated beatings, hair pulling, ear pulling, and belt whipping directed at the children themselves, together with evidence that the children had suffered psychological harm from that abuse. *Id.* The court remanded for consideration of undertakings rather than treating the abuse as categorically grave.

The cases consisting of clearly grave risk look nothing like this one. In *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000), the father beat his wife repeatedly over a period of years, including a single assault in October 1996 that left her face, chest and knees swollen and bruised and a tooth broken; had attacked his adult son and then brought his young daughter into the room to

look at her bloodied half-brother; had threatened to kill a neighbor; violated the orders of the courts of both Massachusetts and Ireland; and had absconded from Massachusetts criminal charges, with a default warrant outstanding and a federal unlawful-flight complaint issued. *Id.* at 209-12 & n.3. In *Van De Sande v. Van De Sande*, 431 F.3d 567 (7th Cir. 2005), the father beat and verbally abused his wife several times a week throughout the marriage, at times in front of the children; slammed her head against a wall and choked her when she was seven months pregnant and threatened to push her down a flight of stairs; struck and repeatedly spanked his daughter; and threatened to kill his wife and the children. In *Baran v. Beaty*, 526 F.3d 1340, 1343, 1346 (11th Cir. 2008), the father drank daily, carried his naked infant son balanced on one hand into the night while intoxicated, swung a telephone at the mother's head as he threatened to "bash her head in" while she held the infant, and told her the child "would die" and that she could not blame him if "something happened to" the child.

The line is clearly drawn in the First Circuit's own distinction. *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000), was a case decided the same year as *Walsh*, and the court held: "Lynn's allegations of verbal abuse and an incident of physical shoving are distinct from the 'clear and long history of spousal abuse' presented in Walsh." The court emphasized that "Lynn has never alleged that Whallon abused Micheli, either physically or psychologically." *Id.*

Here, Respondent's declaration alleges no act of physical violence toward A.G.P. or toward E.G.P. The Answer asserts that Petitioner subjected "the Children directly" to serious domestic violence on at least two occasions, citing Portillo Decl. ¶¶ 17-18, 28-31, and 36-38, but those paragraphs describe, at most, conduct directed at Respondent, with children present or nearby.

**2. Violence alleged against Respondent is not, without more, a grave risk to the children.**

"Spousal abuse . . . is only relevant under Article 13(b) if it seriously endangers the child. The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Souratgar v. Lee*, 720 F.3d 96, 103-04 (2d Cir. 2013). "Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Id.* at 104. The district court in *Souratgar* had credited evidence that the father "kicked, slapped, grabbed, and hit" the mother, and return was ordered nonetheless, because there was "no credible evidence of any harm directed against the child."

**3. The inquiry is prospective, and the declaration is silent for the thirty-three months before the removal.**

Article 13(b) asks whether return "would expose" the child to harm. In *Baran*, the Eleventh Circuit explained that a district court "was not required to find Samuel had previously been physically or psychologically harmed; it was required to find returning him to Australia would expose him to a present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation." 526 F.3d at 1346. Proof of past harm is neither necessary nor sufficient. The question is whether harm is highly probable on or after the date of return.

The Eighth Circuit applied that principle two years ago. In *Mejia Rodriguez v. Reyes Molina*, 96 F.4th 1079 (8th Cir. 2024), the respondent submitted eight photographs, five of which the district court described as showing significant bruises on the child's body consistent with being struck by a belt. The petitioning mother admitted that she had once used a belt to

discipline the child. Return was ordered, and the Eighth Circuit affirmed: "Even if the magnitude of the harm on that occasion constituted serious abuse, we cannot say that the district court clearly erred in finding that it was not 'highly probable' that similar abuse would continue upon the child's return." *Id.* at 1084.

*Nunez-Escudero* is to the same effect: the mother there alleged that the father had "physically, sexually and verbally abused her" and that she had seen her father-in-law hit his youngest son with a wooden plunger, and the Eighth Circuit found that showing "general," 58 F.3d at 376-77, reversed and remanded, and reiterated that "only severe potential harm to the child will trigger this Article 13b exception," *id.* at 377. *Accord Acosta*, 725 F.3d at 876 ("General evidence of harm is insufficient to satisfy Article 13b.").

Respondent's declaration alleges nothing in 2023, nothing in 2024, and nothing in January 2025. Thirty-three months separate the last incident she describes from the removal. If photographed corporal abuse of the child did not make recurrence highly probable in *Mejia Rodriguez*, an uncorroborated account that ends nearly three years before the removal cannot do so here.

**4. The firearm allegation is not established by Respondent's own account.**

Respondent's Third Defense asserts "an incident in which Petitioner brandished a firearm in front of the Children." Answer, Third Affirmative Defense. Her declaration describes a camping trip on May 29, 2020. Portillo Decl. ¶¶ 28–29. Within that single paragraph the firearm is accounted for four different ways: Petitioner "grabbed a gun from a family friend's tent"; Petitioner "had brought a gun he borrowed from a friend"; Respondent "saw the gun for the first time when [they] were arguing and he pulled it out"; and Petitioner "grabbed Arnulfo's gun." These accounts cannot all be true.

As to the children, the declaration places all of them except E.G.P., then four years old, "in a tent playing" at the relevant time. *Id.* ¶ 28. A.G.P., then six, was not present on Respondent's own account. The declaration does not allege that the firearm was pointed at any person, that it was discharged, or that any child saw it.

**5. The cartel allegations do not carry the defense either.**

Respondent's cartel allegations are surmise, and on the face of the declaration Respondent says as much. Of the central incident she states, "I did not know about this incident at the time it happened." Portillo Decl. ¶ 49. Of the children's claimed contact with cartel members, "I later found out." *Id.* ¶ 51. Of Petitioner's involvement generally, "I began to suspect." *Id.* ¶ 22. Of three fires outside her house, "I recognized it as a cartel signal." *Id.* ¶ 46. Her conclusion is expressly predictive. *Id.* ¶ 62. No allegation places A.G.P. or E.G.P. at a described cartel encounter on a stated date.

Respondent also invokes the Department of State's travel advisory for the region. Answer, Third Affirmative Defense. Generalized regional violence affecting a population at large does not establish a grave risk to a particular child. In *Silverman* the en banc Eighth Circuit rejected precisely that argument: the evidence "centered on general regional violence, such as suicide bombers, that threaten everyone in Israel," which "is not sufficient to establish a 'zone of war' which puts the children in 'grave risk of physical or psychological harm' under the Convention." 338 F.3d at 901.

**6. Return is to Mexico, not to Petitioner.**

Should the Court nonetheless find a grave risk, the relief Petitioner seeks is narrower than the defense assumes. Return under the Convention is return to a country, not to a parent. Convention art. 12. A.G.P. and E.G.P. hold a subsisting Chihuahuan judgment placing *guarda y*

*custodia* with Respondent, to be exercised at a designated address. On return the children resume living with Respondent under that judgment, and the Second Family Court decides what contact is appropriate. Petitioner does not ask this Court to award him custody and could not obtain it. Convention art. 19.

The Eighth Circuit has held that the inquiry does not include an adjudication of the underlying custody dispute and that “it is not relevant to this Convention exception who is the better parent in the long run.” *Nunez-Escudero*, 58 F.3d at 377. As to psychological proof on separation, the court held only that “we cannot conclude that psychological reports are per se irrelevant” to the Article 13(b) question. *Id.* at 378.

Should the Court find that Respondent has carried her burden, Petitioner requests the opportunity to be heard on ameliorative measures before return is denied. *Golan v. Saada*, 596 U.S. 666, 681–82 (2022). *Golan* holds that a court is not categorically required to consider such measures, but it may, and the question is committed to the court's discretion. *Id.* Petitioner therefore offers, strictly in the alternative, undertakings that bind him alone and ask nothing of the Chihuahuan court: that the children return directly to Respondent’s custody at the address the March 8, 2021 judgment already designates; that Petitioner exercise no unsupervised contact until the Second Family Court rules; and that Petitioner file the return order with the Second Family Court and seek no *ex parte* relief before the first contested hearing. These are deliberately narrow. Undertakings “should be limited in scope,” and conditioning return on a foreign court’s order “raises serious comity concerns.” *Danaipour v. McLarey*, 286 F.3d 1, 22–23 (1st Cir. 2002).

**C. Respondent cannot establish consent or acquiescence under Article 13(a).**

Acquiescence "requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070. Consent and acquiescence are Respondent's to prove. 22 U.S.C. § 9003(e)(2)(B).

The defense fails on a single fact. On January 6, 2025—three weeks before the removal—Petitioner went to the Second Family Court and reported that Respondent intended to take the children to the United States without his consent. Filing No. 3-10. That court ordered Respondent to appear on January 30, 2025 with the children and their passports, and later directed her to surrender the passports and laser visas. Filing No. 3-7. A parent who is litigating to stop a removal has not acquiesced in it, and nothing in the record shows an act or statement of the formality *Friedrich* requires. Respondent's three contrary points do not survive the record.

First, Respondent quotes Petitioner as having "decided not to go to court that same day to avoid conflicts," Answer, Second and Seventh Affirmative Defenses, and argues that he excused himself from the January 30 hearing. Petitioner went to the courthouse, declined to enter the courtroom to avoid a confrontation, sent his attorney in to appear for him, and embraced his children in the hallway. That is not a renunciation of rights. It is the opposite.

Second, Respondent relies on Petitioner's "voluntary return of the Children" on January 14, 2025. Answer, Second Affirmative Defense. Respondent's own Answer denies that the return was voluntary. Paragraph 15 alleges that Petitioner "unilaterally withheld the Children beyond the court-ordered return date of January 2, 2025," "refused repeated demands for their return," and did not return them "until January 14, 2025, twelve days late and only after Respondent sought police and judicial intervention." Answer ¶ 15. Petitioner denies withholding the children,

but the Court need not resolve that dispute. If the January 14 return was voluntary, it was compliance with a parenting-time order Petitioner had invoked eight days earlier to stop the very removal he is said to have acquiesced in. If it was not voluntary, then on Respondent's own account Petitioner kept the children rather than deliver them — which is not consent to their removal from Mexico.

Third, Respondent relies on six months of inaction before making any Hague requests. *Id.* That premise is wrong. Petitioner returned to the Mexican court on February 5, 2025, six days after the removal; that court referred the matter to the Public Ministry, an investigation followed, and a warrant issued. Filing No. 3-7; Filing No. 3-9. Petitioner filed his Central Authority application on April 15, 2025—roughly ten weeks after the removal, not six months. Filing No. 3-10. The delay that followed was in obtaining counsel in the United States, which took more than six months through a pro bono referral queue. Filing No. 18 ¶ 27. A Mexican national without a visa, without English, and without means does not acquiesce in an abduction by failing to retain American counsel faster.

**D. The Article 12 settlement defense does not defeat return.**

This action was commenced on February 16, 2026. The removal occurred on January 31, 2025. Petitioner acknowledges that the interval exceeds one year by seventeen days, and that Article 12's settlement inquiry is therefore available to Respondent. Respondent bears the burden of demonstrating settlement by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

**1. Settlement requires substantial evidence of significant connections, not evidence of an ordinary childhood.**

The Department of State's contemporaneous Legal Analysis of the Convention states that "nothing less than substantial evidence of the child's significant connections to the new country

is intended to suffice to meet the respondent's burden of proof" for settlement. 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986). The formulation most often applied is to the same effect: "'settled' should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012), *aff'd* on other grounds *sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).

The factors courts apply are similarly those enumerated in *Lozano*: the child's age; the stability of the child's residence in the new environment; whether the child attends school or day care consistently; whether the child attends church or participates in other community or extracurricular activities regularly; the respondent's employment and financial stability; whether the child has friends and relatives in the new area; and the immigration status of the child and the respondent. *Lozano*, 697 F.3d at 57.

**2. Respondent has left most of the factors entirely unproven.**

Respondent's showing on settlement consists of three paragraphs of her own declaration. Portillo Decl. ¶¶ 58–60. They state that the children attend O'Neill-area schools, earn A's and B's, and have made friends.

What the record contains on the remaining factors is nothing. There is no evidence of Respondent's employment, income, or financial stability. There is no evidence of community, religious, or extracurricular involvement beyond school attendance. There is no evidence concerning the family's immigration status; Respondent describes herself only as "a citizen of Mexico living abroad in the United States." *Id.* ¶ 1. Beyond Respondent and the husband with whom she shares the O'Neill residence, Answer ¶¶ 29–30, the record identifies no family member of the children in Nebraska, and contains no declaration, affidavit, or other statement

from any teacher, neighbor, coach, physician, counselor, or family member. A party cannot satisfy a "substantial evidence" threshold by leaving a majority of the enumerated factors blank.

A respondent's failure of proof on a factor is charged against her. In *Rodriguez v. Noriega*, the court held a child not settled where the respondent had shown no community connections, no family in the community, and no lawful immigration status, and it weighed immigration status against settlement even though there was "no reason to think" that either the respondent or the child faced a near-term risk of removal. 732 F. Supp. 3d 990, 1003 (2024).

**3. The children's connections to Mexico remain substantial, and their connections here are derivative.**

Courts weigh a child's continuing ties to the country of habitual residence within the settlement analysis. In *Guevara v. Castro*, the Fifth Circuit relied on the facts that "[m]ost of A.F.'s extended family . . . remain in Venezuela" and that "[m]ost notably, A.F. cannot see her father in the United States." 155 F.4th 353, 365 (5th Cir. 2025). The district court in *Rodriguez v. Noriega* weighed the same consideration, holding a child not settled where consistent school attendance was outweighed by thin community ties, the absence of any family in the community, and the absence of lawful immigration status. 732 F. Supp. 3d 990, 1001-02 (D. Minn. 2024).

A.G.P. lived in Chihuahua for eleven years and E.G.P. for eight. Their extended families remain there, including the paternal grandparents with whom the children regularly stayed. Filing No. 3-10. What Respondent has shown is a household that has been in one place for nineteen months, and nothing beyond it. That is not the substantial evidence of significant connections the Legal Analysis requires before the Convention's default remedy of return gives way. 51 Fed. Reg. at 10,509.

#### 4. If the Court finds the children settled, it should nonetheless order return.

A finding of settlement would not end the inquiry. The *Lozano* majority expressly reserved the question whether a court retains discretion to order return notwithstanding settlement, 572 U.S. 1 at 15, n.5 (2014), and noted the State Department's view that "the Hague Convention confers equitable discretion on courts to order the return of a child even if the court determines that the child is 'settled' within the meaning of Article 12," an interpretation that "would reinforce that Article 12 is not meant to provide repose to the abducting parent." *Id.* Three Justices concurred to explain that the discretion exists: "A court thus has power to order the child's return in the exercise of its sound discretion even where Article 12's obligation to order such return no longer applies." *Id.* at 20 (Alito, J., concurring).

The courts of appeals have confirmed it. The First Circuit held in *Yaman v. Yaman* that "the Convention confers upon a federal district court the authority to order, at its discretion, the return of a child found to be 'now settled,'" and identified as relevant the abducting parent's conduct and "whether return would not be harmful or disruptive even though the child has become settled." 730 F.3d 1, 20-21 (1st Cir. 2013). *Accord Da Costa*, 94 F.4th 174, 180 (1st Cir. 2024).

Respondent took three children across an international border one day after the Second Family Court directed her to surrender their travel documents, and Petitioner learned of it only after they were gone. Article 18 exists so that a removing parent cannot manufacture repose that way; a court may weigh "the abducting parent's misconduct," *Yaman*, 730 F.3d at 21, and may "decline to apply a defense where doing so would reward a parent for wrongfully removing or retaining the children in violation of a Contracting State's custody orders," *Custodio v. Samillan*, 842 F.3d 1084, 1092 (8th Cir. 2016). The children have been in Nebraska a comparatively brief

period, their ties to Mexico—a decade of life, extended families, friends, their schooling, their language—remain substantial, and return would accordingly be neither harmful nor disruptive. Petitioner went to his own courts within six days of the removal and to the Central Authority within ten weeks, and the remaining delay was through no fault of his own.

**E. The remaining defenses are not exceptions under the Convention.**

Respondent's Fourth Defense asserts the mature-child objection. The defense requires proof by a preponderance that the child "has attained an age and degree of maturity at which it is appropriate to take account of her views" and "that the child objects to being returned." *Dubikovskyy v. Goun*, 54 F.4th 1042, 1048 (8th Cir. 2022). The Eighth Circuit "construe[s] the mature child defense narrowly," and "[a] stricter standard also applies when a child's views are the sole reason for denying repatriation." *Id.* Critically, "a preference is not an objection," and there is a "substantive difference between preferring to live in one of two countries . . . and affirmatively objecting to returning to one country." *Id.,* quoting *Rodrigquez*, 817 F.3d at 476-77. That distinction decides this defense. Respondent has offered nothing from either child. Her sole allegation is that the children "do not want to return to petitioner," Answer, Fourth Affirmative Defense—a statement about a parent, not an objection to a country—and one that misconceives the relief sought. *See Custodio*, 842 F.3d at 1089.

Respondent further asserts that "[n]o return order may issue without a prior in camera inquiry," citing *Tsuruta v. Tsuruta*, 76 F.4th 1107, 1117–18 (8th Cir. 2023), and *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007). Neither decision so holds. *Tsuruta* is a habitual-residence case decided under *Monasky*; it contains no discussion of interviewing children, of the mature-child exception, or of any precondition to a return order, and Petitioner has been unable to locate the cited passage. *De Silva* is a mature-child case in which the magistrate judge interviewed the

child in chambers "[w]ith consent of counsel." An interview conducted by consent is not an interview required by law.

Whether to interview a child is left to the Court's discretion. *Custodio*, 842 F.3d at 1088-89; *Kufner v. Kufner*, 519 F.3d 33, 40 (1st Cir. 2008) ("No part of the Hague Convention requires a court to allow the child to testify or to credit the child's views, so the decision rests within the sound discretion of the trial court."). Respondent has asked for an interview. Answer ¶ 37; Answer, Prayer for Relief ¶ (d). The Eighth Circuit has held that such a request must be addressed before the merits, *Armand v. Armand*, No. 25-1998 (8th Cir. Mar. 9, 2026) (per curiam) (unpublished) (citing *Custodio*, 842 F.3d at 1089), and Petitioner accepts that. *Armand* requires no more: it does not hold that an interview must be granted, still less that a return order is unavailable without one. Petitioner takes no position on whether an interview should occur. If the Court conducts one, Petitioner asks that it be placed on the record, that counsel be permitted in the Court's discretion to submit proposed questions, and that the Court weigh the influence of Respondent's exclusive custody since January 2025 in determining whether either child is sufficiently mature and objects. Petitioner reserves all objections.

Respondent's Seventh Defense (waiver) and Eighth Defense (failure to mitigate and delay) are not exceptions recognized by the Convention. The exceptions are those stated in Articles 12, 13, and 20, and they are exclusive. To the extent the Eighth and Eleventh Defenses bear on fees under 22 U.S.C. § 9007(b)(3), Petitioner asks that the issue be reserved for post-judgment motion under NECivR 54.3.

## IV. CONCLUSION

The Convention was written for this case. Two children who had lived their whole lives in one country were taken to another, in the space of a day or two, by one parent, despite a court

order directing her to produce their passports, and without the consent of the other parent who held *patria potestad* over them. The forum that should decide where these children live is the Chihuahuan court that has had jurisdiction since 2020, that entered the judgment both parents signed, and that was actively engaged with this dispute in the days before the removal.

Petitioner respectfully requests that the Court dismiss the claim as to S.G.P. as moot; find that the removal of A.G.P. and E.G.P. on or about January 30-31, 2025, was wrongful within the meaning of Article 3; find that Respondent has not carried her burden on any exception; order the return of A.G.P. and E.G.P. to Mexico on terms the Court finds appropriate; and reserve the question of necessary expenses under 22 U.S.C. § 9007(b)(3) for post-judgment motion.

DATED this 28th day of September 2026.

Respectfully submitted,

**s/ Brianna N. Cotton**
Nebraska Bar No. 28615
Attorney for Petitioner
McGill Law, P.C., L.L.O.
1411 N. 72nd Street
Omaha, NE 68114
Telephone: (402) 548-5418
E-mail: bri@mcgilllawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

**s/ Brianna N. Cotton, No. 28615**